UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LACIE L. GRAMS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | No. 5:13–CV–320–DAE |
| NAC SERVICES, LLC, | § | |
| | § | |
| Defendant. | § | |
| | § | |
| | § | |

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

On September 11, 2014, the Court heard argument on Defendant NAC

Services, LLC's ("Defendant") Motion for Summary Judgment (the "Motion")

(Dkt. # 19).  Glen Levy, Esq., represented Plaintiff Lacie L. Grams ("Plaintiff")

and Christopher Neal, Esq., appeared on behalf of Defendant.  After careful

consideration of the arguments at the hearing and in the supporting and opposing

memoranda, the Court **GRANTS IN PART AND DENIES IN PART**

Defendant's Motion.

BACKGROUND

Defendant employed Plaintiff from October 2012 until March 2013.

("Grams Dep.," Dkt. # 19-2 58:6–9; 118:24–25.)  Plaintiff avers that she was

1

sexually harassed during that time by Lisa Lerma, the Office Manager; Richard Ramos, the Chief Operations Officer; and Christian Olguin, the Yard and Operations Manager. ("Compl.," Dkt. # 1 ¶ 11.) In her complaint and deposition, Plaintiff details that she was subjected to the following events while working for NAC services.

I.    <u>November 2012</u>

Plaintiff states that in November 2012, she went to lunch with three other female employees of Defendant, including Lisa Lerma. (Grams Dep. 69:18–20.) During the car ride, either to or from lunch, one of the women asked what "queefing" meant. (<u>Id.</u> 70:7–10.) Later, after returning to the office, Lerma told Ramos that the women had discussed queefing. (<u>Id.</u> at 70:17–21.) Subsequently, Ramos called Plaintiff back into an office with Lerma, and Plaintiff recounts,

> He called me, like, from down the hall. 'Lacie, come in here.' And he said, 'Do you queef?' And I said, 'I'm not answering that.' And then he said, 'Well, let me ask you another question. How often do you queef or when do you queef, what kind of sexual position—what kind of position are you in with your boyfriend when you queef?' And I just said, 'I'm not answering that' and I walked away.

(<u>Id.</u> 71:7–18.) Plaintiff states that after she left, she heard Ramos and Lerma continue discussing the topic, but they did not try to engage her in the conversation again. (<u>Id.</u> 74:1–11.)

II.     <u>Late November or Early December 2012</u>

Plaintiff next alleges that a few weeks after the October incident, the

following occurred:

> [Ramos] brought me in his office and—or brought me in Lisa's
> office—sorry.  [Ramos, Olguin, and Lerma] were all in the office.
> And [Ramos] said, 'I'll give you a hundred dollars to flash me.'  And
> I said, 'No.'  And he said, 'Oh, come on, a hundred dollars.'  And I
> said, 'No.'
>
> So a little bit later, Lisa called me and asked me, 'Can we tell [Olguin]
> that you flashed [Ramos] and he gave you a hundred dollars?'  And I
> said, 'No.'  And she did anyways.  And told [Olguin] that I flashed
> [Ramos] and he gave me a hundred dollars.  So when he came into the
> office, he asked me, said, 'I'm surprised you did that.' And I said, 'I
> didn't.'

(<u>Id.</u> 75:2–21.)  Plaintiff states that Patricia Stehling, the human resources manager,

overheard the conversation, and subsequently, Stehling had the following

conversation with Plaintiff:

> [Stehling] asked me, 'Does it bother you, that they asked you that?'
> And I said, 'Yes, but what do you do?'  And she said, 'Well, if you
> don't—if it bothers you, you need to tell them to stop.'  And I said
> 'Okay.'

(<u>Id.</u> 76:4–7.)  Plaintiff testified that she did not tell them to stop explicitly, but she

did tell them "'I'm not answering that' or 'Don't ask me that question.'"  (<u>Id.</u>

76:10–12.)  Plaintiff stated she did not make a formal complaint to Stehling

because she was "[s]cared of losing my job, being treated differently.  I hadn't

been working there very long at all, so I didn't know what would happen—I didn't

want to make things worse, or difficult to work there because I needed my job, and I wanted it to be normal, I guess." (Id. 79:20–24.)

### III.   November to January 2013

Plaintiff states that on three or four occasions, Ramos asked her whether she orgasmed. (Id. 81:3–12.) She responded each time with "I'm not answering that." (Id. 81:21–23.) Ramos also asked her similar questions three to four times per week between November 2012 and January 2013 including, "What's your favorite position to be in?"; "Do you spit or swallow?"; and "Do you have anal sex?". (Id. 82:16–18; 83:3.)

### IV.   January 30, 2013

Plaintiff states that Lerma approached Plaintiff and asked if she would do her a favor by showing Ramos and Olguin her "tits." Plaintiff strenuously refused. Plaintiff indicated that she was offended and that this sort of conduct was unwelcome. Plaintiff states that Lerma then pleaded, "if you just show them your tits, Richard will get me out of going to Vegas with Mando." (Compl. ¶ 11.) Plaintiff replied something to the effect of, "Hell, no. I will not do that." (Id.)

Lerma then called Plaintiff into her office, where Olguin and Ramos were waiting. Ramos allegedly verbally harassed and provoked Plaintiff by asking her questions including, "Why won't you do Lisa a favor?" to which Plaintiff replied she would not and had never flashed her breasts to anyone before. (Id.

4

¶ 12.)  Ramos then asked Olguin whether Plaintiff had "nice boobs."  Olguin responded affirmatively to Ramos, then told Plaintiff that she had "very nice breasts."  (Id.)

Plaintiff states that Olguin, Ramos, and Lerma continued trying to engage her in conversations while she strenuously protested.  Ramos allegedly asker her "Lacie, do you masturbate?  Do you have orgasms?"  Ramos continued stating, "Well, you need to come out of your shell like Lisa.  Right, Lisa?"  To which Lisa responded, "Yes!"  (Id.)  Ramos then told Plaintiff, "I want you to do me a favor.  When you get home tonight, take a really hot shower and touch yourself and you will have the best orgasm that you've ever had.  And then come back and tell me about it."  (Grams Dep. 87:1–4.)

Additionally, at the end of that same day, Olguin and Lerma called Plaintiff into Lerma's office where he stated they had purchased a jacket with Defendant's logo on it for Plaintiff.  (Id. 97:18–98:3.)  Olguin stated that the jacket had her name on it, "Boobylicious."  (Id.)  Plaintiff was upset and went home for the evening.  (Id.)

The following Friday, February 1, 2013, Plaintiff went to Stehling and stated that she was going to quit because she could no longer endure the harassment.  (Id. 90:17–22.)  Plaintiff states that during the conversation with Stehling, she changed her mind and did not actually quit at that time.  (Id. 95:19–

24.)  Stehling reported the incident via email to NAC Services CEO, Armando

Gutierrez, per human resources regulations.  (Id. 93:3–6.)

Once notified of the sexual harassment that Plaintiff alleged occurred,

Gutierrez told Stehling to keep the email confidential, and that he would follow up

in person at the office.  (Compl. ¶ 14.)  Plaintiff argues Gutierrez never actually

followed up in person.  (Id.)

Plaintiff then states that, per Gutierrez's instructions, she and Stehling

confronted Lerma and said that the sexual comments needed to stop.  (Grams Dep.

99:11–13.)  Lerma stated they would.

Plaintiff alleges that subsequent to this conversation, Olguin and

Ramos completely avoided her.  (Id. 100:4–7.)  Plaintiff states that on one

occasion, Ramos yelled at her when she told him an individual had repeatedly

called for him.  (Id. 101:3–10.)  Plaintiff claims she also heard Lerma, Ramos, and

Olguin use her name in whispered conversations.  (Id. 102:21–25.)  Additionally,

Lerma no longer asked Plaintiff to join her for lunch.  (Id. 102:2–5.)  Plaintiff

claims that this working environment was too uncomfortable, and she quit via

email on February 10, 2013.  (Id. 104:9–16.)

After receiving the February 10, 2013 email, Gutierrez contacted

Plaintiff and arranged to take her to lunch.  During that lunch, Plaintiff states that

Gutierrez convinced her to return to work by stating that he would stop the

harassment, that Plaintiff would no longer have to report to or work around her alleged harassers, that she would receive a $12,000 per year raise, that her position would be managerial and exempt, and that she would only have to work between 9 a.m. and 2 p.m.  (Compl. ¶ 15.)

Plaintiff returned to work.  Plaintiff claims Gutierrez did not follow through on his promises and that she was retaliated against. However, Plaintiff testifies that pursuant to her agreement with Gutierrez she was moved to an enclosed office in the same trailer within a week so that she did not have to work in the open area that Lerma, Olguin, and Ramos would pass through frequently during the day (Grams Dep.  110:14–19) and that her promised salary increase was reflected in her paycheck within two pay periods (id. 123: 19–22).  Most importantly, Plaintiff testified that after her return to work, there were no more sexual comments from Lerma, Olguin, or Ramos.  (Id. 116:17–22.)

However, Plaintiff claims that a new employee was spying on her and reporting back to Lerma and that her office was one of a few in which clearly visible security cameras were installed. (Id. 111:18–22; 112:7–11.)  Further, Plaintiff states that she continued to have to report to Lerma.  (Id. 120:14–17.) Plaintiff also implies that Lerma retaliated against her by slamming her door two to three times.  (Id. 117:14–18.)

Nonetheless, Plaintiff states that in the month she worked after Gutierrez convinced her to return to the company, there were no incidents of sexual harassment.  (Id. 127:2–5.)  Additionally, she was not threatened with termination or demotion.  (Id. 127:6–12.)

Plaintiff alleges that the "final straw" occurred on March 8, 2013, and that she then wrote an email resigning from NAC Services, claiming she had no choice but to resign due to the work environment.  (Compl. ¶ 17.)  However, Plaintiff's complaint does not allege what this final straw was.  (See id.)

Around March 15, 2013, Plaintiff filed a charge against Defendant with the Equal Employment Opportunity Commission ("EEOC") alleging sex discrimination, sexual harassment, and retaliation.  (Id. ¶ 7.)  Plaintiff received notice of her right to sue on April 17, 2013.  (Id.)

Plaintiff filed the instant suit on April 18, 2013.  (See Compl.)  On March 14, 2014, Defendant moved for Summary Judgment on all of Plaintiff's claims.  (Dkt. # 14.)  Plaintiff responded on June 20, 2014, and Defendant replied on June 27, 2014.  (Dkt. ## 19, 20.)

LEGAL STANDARD

A court must grant summary judgment when the evidence demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The

8

Court evaluates the proffered evidence in the light most favorable to the non-moving party.  Lemelle v. Universal Mfg. Corp., 18 F.3d 1268, 1272 (5th Cir. 1994).  The Court "examines the pleadings, affidavits, and other evidence introduced in the motion, resolves any factual doubts in favor of the non-movant, and determines whether a triable issue of fact exists."  Leghart v. Hauk, 25 F. Supp. 2d 748, 751 (W.D. Tex. 1998).

In seeking summary judgment, the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party meets its burden, the burden then shifts to the non-moving party "to go beyond the pleadings and by [his or her] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  Id. at 324 (internal quotation marks omitted).  The non-moving party "must, either by opposing evidentiary documents or by referring to evidentiary documents already in the record, set out specific facts showing a genuine issue as to a material fact exists."  Leghart, 25 F. Supp. 2d at 751.  "[Non-movants] are required to identify the specific evidence in the record and to articulate the precise manner in which that evidence supports their claim."  Id.  Further, "Rule 56 does not require the district court to sift through the record in search of evidence to support a [non-movant's] opposition to summary judgment.  Id.

If a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," the Court must grant summary judgment against that party.  Celotex, 477 U.S. at 322.

## DISCUSSION

Defendant has moved for summary judgment on each of Plaintiff's claims.  (Dkt. # 14.) The Court will address each claim in turn.

I.    Sexual Discrimination and Harassment

Plaintiff's first claim is that she was subjected to sexual discrimination and harassment in violation of Title VII of the Civil Rights Act of 1964.  (Compl. ¶¶ 19–22.)  Title VII provides that

> [i]t shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . .

42 U.S.C. § 2000e-2(a).

In evaluating a sexual harassment claim, the Court applies the Ellerth/Faragher analytic framework.  Casiano v. AT&T Corp., 213 F.3d 278, 283 (5th Cir. 2000).  This framework derives from Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998), and Faragher v. City of Boca Raton, 524 U.S. 775 (1998).  Under this framework, a court first evaluates whether the employee has suffered a

"tangible employment action."  Casiano, 213 F.3d at 283.  If so, the court evaluates the suit as a "quid pro quo" case; if not, then the court adjudicates the suit as a "hostile work environment" case.  Id.  If the court determines that a tangible employment action has occurred, the defendant is strictly liable for the harassment.  See Ellerth, 524 U.S. at 765.  If there has been no tangible employment action, then the defendant may assert the affirmative defense laid out in Ellerth/Faragher and discussed below.  See id.

> A.    Tangible Employment Action

A tangible employment action is defined as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  Ellerth, 524 U.S. at 761.  To constitute a tangible employment action the conduct at issue must have been undertaken by a supervisor "or other person acting with the authority of the company."  Id. at 762.  "[A]n employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim."  Spencer v. Schmidt Elec. Co., --- F. App'x ----, No. 13–20282, 2014 WL 3824339, at *4 (5th Cir. Aug. 5, 0214) (quoting Vance v. Ball State Univ., --- U.S. ----, 133 S. Ct. 2434, 2439 (2013)).

However, a constructive discharge[1] can constitute a tangible employment action if "a supervisor's official act precipitates the constructive discharge." <u>Penn. State Police v. Suders</u>, 542 U.S. 129, 140–41 (2004); <u>see also Aryain v. Wal-Mart Stores Tex. LP</u>, 534 F.3d 473, 480 (5th Cir. 2008).  In this situation, a tangible employment action has occurred, and a defendant company will be strictly liable and unable to assert the <u>Ellerth/Faragher</u> affirmative defense. <u>Suders</u>, 542 U.S at 141.

In the present case, Defendant argues that Plaintiff was not terminated by Defendant, and she cannot claim to have suffered a tangible employment action.

In reviewing the evidence in the light most favorable to Plaintiff, the following facts are undisputed.  Plaintiff first intended to quit on Friday, February 1, 2014, when first complained to Stehling.  However, prior to the end of that meeting, Plaintiff decided not to quit.  Nonetheless, Stehling, per human resources requirements, reported Plaintiff's complaint to Gutierrez.  Gutierrez stated he would address the situation with Lerma, Ramos, and Olguin that week.  During that week, Stehling and Plaintiff also spoke to Lerma regarding the harassment, and Lerma said it would not continue.  Plaintiff reported no other incidents of sexual harassment after this conversation; however, Plaintiff did complain that

---

[1] A constructive discharge occurs when the conditions an employee endured "become so intolerable that a reasonable person in the employee's position would have felt compelled to resign". <u>Suders</u>, 542 U.S at 141.

Ramos yelled at her, but did not otherwise speak to her, and Olguin no longer spoke to her except regarding work related matters.  Further, Plaintiff asserts that Lerma no longer asked her to lunch.  Plaintiff claims that this "harassment" prompted her to send a resignation letter to Gutierrez on February 10, 2013.  In response, Gutierrez offered Plaintiff a raise, a new office location, among other things, and promised to end the sexual harassment.  Plaintiff's own testimony asserts that after this conversation, she was not subjected to any further sexual harassment.[2]

Because Plaintiff can only point to "minor slights" and absolutely no sexual harassment after this date, Plaintiff's resignation a month later does not meet the standard for a constructive discharge.  Because there was no longer any sexual harassment, there can be no argument that her resignation was caused or attributable to an act by a supervisor under this statute.  Therefore, because Plaintiff did not suffer a tangible employment action, her complaint must be analyzed as a hostile-work-environment claim, for which the Ellerth/Faragher affirmative defense is available to Defendant.

---

[2] There is no question that the acts the Plaintiff describes in her Complaint which the Court must accept at this point as true were clearly sexual harassment within the definition of the statute.

B.    <u>Hostile Work Environment</u>

To demonstrate a hostile work environment, an employee must show that (1) he or she belongs to a protected group; (2) he or she was subject to unwelcome sexual harassment; (3) the complained-of harassment was based upon his or her sex; (4) the harassment affected a term, condition, or privilege of employment[3]; and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action.  <u>Farpella-Crosby v. Horizon Health Care</u>, 97 F.3d 803, 806 (5th Cir. 1996).

A court must undertake an evaluation of the particular circumstances of each case to determine whether a hostile environment exists.  <u>See</u> <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17 at 23.  "These [circumstances] may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  <u>Id.</u>  Similarly, a court may take into account psychological harm as one of the relevant factors.  <u>Id.</u>

There is little dispute that, taking the facts in the light most favorable to Plaintiff, she can establish the first three elements of a cause of action for a hostile work environment.  As the Court previously noted, the Plaintiff was clearly

---

[3] The Fifth Circuit defines this as "sexual harassment . . . so pervasive or severe as to alter her conditions of employment and create an abusive working environment."  <u>Farpella-Crosby</u>, 97 F.3d at 806.

14

subjected to conduct that was, without a doubt, unwelcome sexual harassment. Therefore, the Court will focus its attention on the fourth and fifth factors.

    1.    Harassment Affecting a Term, Condition, or Privilege of Employment

For harassment to affect a term or condition of employment, the Fifth Circuit maintains that to be actionable under Title VII, "sexual harassment must be sufficiently pervasive or severe to alter the conditions of employment and create an abusive working environment." Id. To meet this standard, a plaintiff must show more than the "mere utterance of an . . . epithet which engenders offensive feelings in an employee." Id. (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 22 (1993). The harassment "must be both objectively and subjectively abusive. Williams v. Dept. of Navy, 149 Fed. App'x 264, 268 (5th Cir. 2005). "Sexually discriminatory verbal intimidation, ridicule, and insults may be sufficiently severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment that violates Title VII. Farpella-Crosby, 97 F.3d at 806. "[T]he work environment must be one that a reasonable person would find hostile or abusive . . . ." Pulliam v. Comcorp of Baton Rouge, Inc., No. 08–236–BAJ–SCR, 2010 WL 4939993, at *3 (M.D. La. Oct. 28, 2010). "Simple teasing, offhand comments, and isolated incidents, unless they are extremely serious, are not sufficient to affect the terms, conditions or privileges of employment." Id. (citing Alaniz v. Zamora-Quezada, 591 F.3d 761, 771 (5th Cir. 2009)). To do this, the

Court evaluates "the totality of the circumstances, including such factors as the frequency of the conduct, the severity of the conduct, whether the conduct is physically threatening or humiliating, and whether the conduct unreasonably interferes with an employee's work performance." Williams, 149 Fed. App'x at 268. The Fifth Circuit has held that "the harassment must be so severe and pervasive that it destroys a protected classmember's opportunity to succeed in the work place." Williams, 149 Fed. App'x at 268. "Properly applied, [the standards for judging hostility under Title VII] will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender related jokes, and occasional teasing." Faragher, 524 U.S. at 788.

In Royal, the Fifth Circuit found that a hostile work environment existed when two other employees sniffed and hovered over Plaintiff (a woman) "in a small, confined space." Royal, 736 F.3d at 401–02. The Court found that the conduct was sufficiently pervasive because "Royal worked in a small office area and was subject to each maintenance man's objectionable conduct approximately twelve times over four days. The only thing interrupting this conduct seems to have been Royal's termination." Id. at 402. The court continued finding that "[t]hese menacing acts, which were done over Royal as she was sitting and some of which were done by a man who had previously been in prison, can certainly be seen as 'physically threatening,' 'humiliating,' and frequent, three factors that

16

indicate sexual harassment . . . ." <u>Id.</u>  The court acknowledged that the short time frame at issue lent itself to finding the conduct pervasive.[4]  <u>Id.</u> at 403.

In contrast, when a female employee complained of "a few scattered comments . . . that may be interpreted as being of a sexual nature," the Fifth Circuit found that the remarks "simply [did] not approach the level of 'extreme conduct that would prevent [the plaintiff] from succeeding in the workplace.'"  <u>Silva v. City of Hidalgo, Texas</u>, --- F. App'x ----, No. 13–41064, 2014 WL 3511685, at*4 (5th Cir. Jul. 17, 2014).

---

[4] In contrast, the Fifth Circuit found that there was no hostile work environment in <u>Shepherd v. Comptroller of Pub. Accounts of the State of Texas</u>, 168 F.3d 871 (5th Cir. 1999).  In <u>Shepherd</u>, the defendant engaged in unwanted touching of the plaintiff's arm, commented that her elbows were the same color as her nipples, commented that the plaintiff had big thighs while miming peering under her dress, attempted to look down her shirt, and a coworker told her she could sit on his lap. <u>Id.</u> at 872–73.  The court noted that the comments were spread out over more than a year, and therefore were less pervasive.

Similarly, in <u>Hockman v. Westward Commc'ns, LLC</u>, 407 F.3d 317 (5th Cir. 2004), the Court found that the alleged harassment did not create a hostile work environment when the defendant made a comment to the plaintiff about another employee's body, slapped plaintiff's behind with a newspaper, grabbed or brushed plaintiff's breast and behind, held her cheeks once in an attempt to kiss her, asked her to come in early to work so they could be alone together, and once stood in the bathroom doorway while she was inside.  <u>Id.</u> at 328.  The conduct here was spread out over a period of a year and a half.

However, as <u>Royal</u> points out, <u>Shepherd</u> applied the wrong standard, namely that conduct that was pervasive but not severe was not actionable.  <u>Royal</u>, 736 F.3d at 403.  And <u>Hockman</u>, relied heavily on <u>Shepherd</u> for its rationale.  <u>Id.</u>

2.  <u>Notice and Remedial Action</u>

"A defendant may avoid Title VII liability when harassment occurred, but the defendant took 'prompt remedial action' to protect the claimant." <u>Williams-Boldware v. Denton Cnty., Texas</u>, 741 F.3d 635, 640 (5th Cir. 2014). The determination of whether an employer took 'prompt remedial action' is case specific, but includes considering "the timing and severity of the employer's response, as well as the effectiveness of the response." <u>Wyly v. W.F.K.R., Inc.</u>, --- F. Supp. 2d ----, 2014 WL 652279, at *2 (W.D. Tex. Feb. 19, 2014). Further, a plaintiff carries the burden of demonstrating that the defendant employer did not take effective action. <u>Id.</u>

The notice to a defendant may be either actual or constructive. <u>Sharp v. City of Houston</u>, 164 F.3d 923, 930 (5th Cir. 1999). To demonstrate constructive notice, a plaintiff must show that the harassment was "so open and pervasive that knowledge can be imputed to the employer." <u>Taylor v. Richardson Auto. II, L.P.</u>, Civ. A. 3:05CV2397-D, 2007 WL 1964665, at *7 (N.D. Tex. July 6, 2007). However, the Fifth Circuit will not impute a "supervisor's knowledge of his own alleged conduct to [a] defendant company for the purposes of the notice requirement of a sexual harassment claim under Title VII. <u>Wilson v. Sysco Food Servs. Of Dallas, Inc.</u>, 940 F. Supp. 1003, 1011 (N.D. Tex. 1996) (citing <u>Sims v. Brown & Root</u>, 78 F.3d 581 (5th Cir. 1996)).

However, because a plaintiff has the burden of proof in a hostile work environment claim, a defendant "can meet its summary judgment obligation by pointing the court to the absence of evidence to support [a plaintiff's] claim." Taylor, 2007 WL 1964665, at *3.  To survive summary judgment a plaintiff must go beyond its "pleadings and designate specific facts showing there is a genuine issue for trial."  Id.

In Wyly, the court found that defendant took prompt remedial action when, after learning of an incident of harassment, the defendant terminated the offending employee.  (Id. at *3.)  The court opined: "In fact, [the defendant] likely could have avoided liability even with a lesser sanction, though it would still have needed to be effective in preventing future harassment."  Id.; see also Williams-Boldware, 741 F.3d at 640 (finding that termination is not the only method of satisfying the 'prompt remedial action' requirement).  The court found that because the defendant took prompt remedial action, the plaintiff could not succeed on her claim of a hostile work environment, and there was no further need to address whether the alleged conduct was severe or pervasive.  Wyly, 2014 WL 652279, at*3.

In the present case, as in Wyly, the fifth element required to demonstrate a hostile work environment—whether the employer knew or should

have known of the harassment and failed to take prompt remedial action—is dispositive.

First, the Court finds that Plaintiff has not produced, cited, or argued any evidence demonstrating a genuine issue of material fact as to whether Defendant had constructive notice.  Therefore, the Court finds, as in Taylor, that Defendant did not have constructive notice of the harassment Plaintiff allegedly suffered.

Second, Plaintiff admits that she did not inform anyone of the harassment she suffered from Lerma, Olguin, and Ramos until she met with Stehling around February 1, 2014.  Previously, when Stehling had witnessed one of the harassment incidents to which Plaintiff was subjected, Plaintiff declined to make a formal complaint.

However, on February 1, 2014, Plaintiff did complain, and the complaint reached Gutierrez.  In response, Gutierrez directed Plaintiff and Stehling to speak to Lerma regarding the harassment, and he stated that he would also address the issue with Ramos, Olguin, and Lerma.  (Grams Dep. 98:20–99:2.) Plaintiff did this, and Lerma responded that it would stop.  (Id. 99:17–23.) Plaintiff stated that Gutierrez never came in person, but that she did not know whether he had held a conversation with Ramos, Olguin, or Lerma via telephone. (Id. 104:13–21.) According to Plaintiff, there were no more sexual harassment

incidents after this.  However, Plaintiff nonetheless tendered a resignation approximately a week later.  Gutierrez, in response, offered Plaintiff a higher salary and other benefits, and promised she would not be subject to any further harassment.  Plaintiff states that between this time and early March, when she actually resigned, there were no further incidents of sexual harassment.

Based on these events, taken from Plaintiff's own deposition, it appears that as soon as Defendant learned of the sexual harassment directed at Plaintiff, it immediately took effective action.  Although Defendant did not resort to firing the offenders, Title VII does not require "draconian penalties," Williams-Boldware, 741 F.3d at 640, particularly in this case where Defendant's actions were effective; Plaintiff did not experience any sexual harassment after early February.  Thus, Plaintiff has failed to show a genuine issue of material fact as to whether Defendant knew of the harassment and failed to take prompt remedial action.  Therefore, the Court **GRANTS** Defendant's Motion for Summary Judgment regarding Plaintiff's claim for sexual harassment and discrimination.

II.     Wrongful Termination and Retaliation

A.     Wrongful Termination

To establish wrongful termination, a plaintiff must show that he or she "(1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer;

and (4) was replaced by someone outside of his protected group or was treated less favorably than other similarly situated employees outside the protected group." Willis v. Cleco Corp., 749 F.3d 314, 320 (5th Cir. 2014).

As in Willis, Plaintiff here has not put forth any evidence that she "was treated less favorably than other similarly situated employees outside the protective class." See Willis, 749 F.3d at 320. Plaintiff failed to "identify a similarly situated comparator—another employee who was treated differently under nearly identical circumstances." Id. Therefore, because Plaintiff cannot establish a prima facie case for wrongful termination, the Court **GRANTS** Defendant's Motion for Summary Judgment on this claim.

B.   Retaliation

"Pursuant to Title VII, an employer may not discriminate against an employee because the employee has 'opposed any practice made an unlawful employment practice . . . or because he [or she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' under Title VII." LeMaire v. La. Dept. of Trans. and Development, 480 F.3d 383, 388 (5th Cir. 2007). A court applies the McDonnell Douglas burden-shifting analysis to retaliation claims. Id. "[F]irst, the employee must demonstrate a prima facie case of retaliation." Royal v. CCC&R Tres Arboles, L.L.C., 736 F.3d 396, 400 (5th Cir. 2013). Next, "the burden shifts to the employer, who must state a

legitimate non-retaliatory reason for the employment action.  Id.  Finally, "if that burden is satisfied, the burden then ultimately falls to the employee to establish that the employer's stated reason is actually a pretext for unlawful retaliation."  Id.

In order to establish a prima facie case of retaliation under Title VII, a plaintiff must show that "(1) she engaged in activity protected by the statute, (2) an adverse employment action occurred, and (3) a causal link exists between the protected activity and the adverse employment action."  Haire v. Bd. of Sup'rs of Louisiana State Univ. Agricultural and Mechanical College, 719 F.3d 356, 367 (5ht Cir. 2013).

"An adverse employment action is one that 'a reasonable employee would have found . . . [to be] materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Hernandez v. Yellow Transp., Inc., 670 F.3d 644, 675 (5th Cir. 2012) (quoting Aryain, 534 F.3d at 484)); see Spencer v. Schmidt Elec. Co., --- F. App'x ----, at*5 (5th Cir. Aug. 5, 2014) (finding that cursing at the plaintiff was the sort of "minor annoyances [or] simple lack of good manners' not actionable for a Title VII retaliation claim" (quoting Burlington N. & Santa Fe R.R. Co. v. White, 548 U.S. 53, 68 (2006))).  "The materiality requirement separates significant from trivial harms."  Davis v. Fort Bend Cnty., ---F.3d----, 2014 WL 4209371, at *8 (5th Cir. Aug. 26, 2014) (internal quotation marks

omitted).  "'[P]etty slights, minor annoyances, and simple lack of good manners'
are not actionable retaliatory conduct."  Id. (quoting White, 548 U.S. at 68).  The
White court elucidated that this was a fact specific inquiry:

> A supervisor's refusal to invite an employee to lunch is normally
> trivial, a nonactionable petty slight.  But to retaliate by excluding an
> employee from a weekly training lunch that contributes significantly
> to the employee's professional advancement might well deter a
> reasonable employee from complaining about discrimination.

White, 548 U.S. at 69 (internal citations omitted).  The Fifth Circuit notes that
merely listing the adverse actions she suffered does not allow a plaintiff to meet his
or her burden on summary judgment.  Davis, 2014 WL 4209371, at *8.  A plaintiff
must go beyond that and provide evidence of the circumstances "that make those
actions 'materially adverse.'"  Id.

        The Court has already found that Plaintiff was not terminated, either
actually or constructively, therefore she cannot point to that as an adverse
employment action.  Plaintiff's own testimony states that after her complaint
regarding sexual harassment, the harassment stopped.  The only remaining
incidents she avers occurred are (1) when Ramos yelled at her on one occasion; (2)
when Lerma slammed her door on two to three occasions; (3) that she continued to
have to report to Lerma; (4) that a security camera was installed in her office and
the offices of two other individuals; and (4) that Lerma no longer asked Plaintiff to
join her for lunch.

After the September 10, 2014 hearing, the Court finds that the current state of the evidence precludes summary judgment. However, because Defendant's argument at the hearing indicates that further discovery may be necessary on the limited issue of retaliation, the Court hereby **reopens discovery for thirty days from the date of this Order**. Discovery shall be limited to any allegedly retaliatory treatment Plaintiff suffered between February 1, 2013, and her resignation on March 8, 2013. Therefore, the Court **DENIES WITHOUT PREJUDICE** Defendant's Motion for Summary Judgment on this claim.

III.   Negligent Hiring, Supervision, Training and Retention

Plaintiff's final claims are for negligent hiring, supervision, training, and retention. (Compl. ¶¶ 27, 28.)

> The imposition of liability on an employer for negligent hiring requires the plaintiff to present evidence that his injuries 'were brought about by reason of the employment of the incompetent servant and be, in some manner, job-related. Stated another way, the negligence in hiring the employee must be the proximate cause of injuries to the plaintiff.'

Polly v. Houston Lighting & Power Co., 803 F. Supp. 1, 8 (S.D. Tex. 1992) (quoting Dieter v. Baker Service Tools, A Division of Baker Int'l, Inc., 739 S.W.2d 405 (Tex. App. 1987)).

To state a claim for negligent hiring, retention, and supervision, a plaintiff must show there was "a legal duty to hire, supervise, or retain competent employees," that the defendant breached that duty, and that the breach of the duty

was the proximate cause of the plaintiff's injuries.  Mumphrey v. Texas College, No. 2:05–CV–413, 2006 WL 3498432, at*7 (E.D. Tex. Dec. 5, 2006).

However, under Texas law, a claim for negligent hiring may only lie when an underlying common law tort has occurred.  Mumphrey, 2006 WL 3498432, at * 7; see also Morales v. Corinthian Colleges, Inc., at No. SA11–CV00947–DAE, 2013 WL 3994643, *5 (W.D. Tex. Aug. 2, 2013).  The Texas Court of Appeals maintains:

> Sexual harassment has never been a common law tort; as a cause of action it is a statutory creation.  A negligent supervision claim cannot be based solely upon an underlying claim of sexual harassment per se, because the effect would be to impose liability on employers for failing to prevent a harm that is not a cognizable injury under the common law.  Moreover, if we allowed a sexual harassment finding to supply the basis for recovery on a negligent hiring claim, the statutory procedures and limitations applicable to such claims would be rendered superfluous.  Accordingly, negligent hiring will be a viable cause of action in a sexual harassment case only if the harassment encompasses misconduct that is independently actionable under the common law, such as battery or intentional infliction of emotional distress.

Gonzales v. Willis, 995 S.W.2d 729, 740 (Tex. App. 1999).  Therefore, because Plaintiff's complaint predicates her claim for negligent hiring on the instances of sexual harassment she alleges she suffered and not an independently actionable common law tort, her negligent hiring claim is precluded as a matter of law.  Therefore, the Court **GRANTS** Defendant's Motion for Summary Judgment on this claim.

26

<u>CONCLUSION</u>

For the reasons stated above, the Court **GRANTS IN PART AND DENIES IN PART** Defendant's Motion for Summary Judgment (Dkt. #14).

IT IS SO ORDERED.

DATED:  September 11, 2014, San Antonio, Texas.

_____

David Alan Ezra
Senior United States Distict Judge